[Civ. No. 13955. First Dist., Div. One. Apr. 28, 1949.]

EVERETT A. HOLMAN et al., Plaintiffs and Appellants, v. COUNTY OF SANTA CRUZ et al., Defendants; BEN LOMOND FIRE DISTRICT et al., Defendants and Appellants.

Wyckoff, Gardner, Parker & Boyle for Plaintiffs and Appellants.

Bohnett, Hill, Cottrell & Bohnett, Jos. A. Brown, Harry Gottesfeld and L. D. Bohnett for Defendants and Appellants.

WARD, J.—Defendants Ben Lomond Fire District and Earl L. Lyon, Frank R. Pimentel, and F. A. Whitaker, commissioners of Ben Lomond Fire District, filed on October 3, 1947, a notice of appeal from a judgment and decree entered

on July 28, 1947, and from certain orders granting or denying motions in reference to certain injunctive proceedings and from the order denying defendants' motion for a new trial made on September 10, 1947. The latter order is not appealable and the appeal therefrom is dismissed.

On January 3, 1948, the same defendants appealed from an amended judgment and decree dated September 10, 1947, and also from an order granting a temporary injunction made on April 17, 1947. The notice dated January 3, 1948, also refers to certain orders made subsequent to the entry of the original judgment on September 10, 1947. The latter orders are similar to the second portion of the matters noted in the original appeal.

On October 8, 1947, the records show an appeal filed by plaintiffs from the "Order Setting Aside And Vacating Portion Of Judgment" dated September 10, 1947. Thereafter, on December 23, 1947, plaintiffs filed a second notice of appeal from the "Amended Judgment And Decree" dated September 10, 1947.

On November 8, 1946, plaintiffs, as citizens of a certain fire district of Santa Cruz County, filed a complaint naming as defendants the county of Santa Cruz, a political subdivision of the State of California, J. F. Helms, County Treasurer of the County of Santa Cruz, Earl L. Lyon, Frank R. Pimentel and F. A. Whitaker, commissioners of Ben Lomond Fire District, and Ben Lomond Fire District, a fire district of the State of California. It was prayed that defendants be enjoined from collecting a tax upon property situate in Ben Lomond Fire District (hereafter called district, or fire district) on the ground that the proceeds would be used "for illegal and unauthorized purposes," and accordingly defendants were restrained from "paying out or disbursing the proceeds of the collection of said tax, or any part thereof, until the further order of this Court."

One week later plaintiffs filed an amended complaint, praying for injunctive relief. Paragraph one of the amended complaint alleges that the defendants Lyon, Pimentel and Whitaker "at all times herein mentioned were and now are all of the duly elected, qualified and acting commissioners of defendant Ben Lomond Fire District. Defendant Ben Lomond Fire District . . . at all times herein mentioned was and now is a fire district of and organized under the laws of the State of California." The complaint alleged that, "On or about the 1st day of August, 1946, defendant Commissioners

in writing reported to the Board of Supervisors of said defendant County of Santa Cruz its budget for and an estimate of the amount of the financial needs of said defendant District for the fiscal year commencing July 1, 1946 and ending June 30, 1947, in words and figures as follows: Salaries and Wages, $1600.00; Maintenance and Operation, $2800.00; and Capital Outlay, $16700.00.

"Thereafter and on or about the 30th day of August, 1946, said Board of Supervisors of said County of Santa Cruz, at the request of said Commissioners, levied . . . a tax upon all the taxable property within said District at the rate of Three Dollars and 96/100 ($3.96) per $100.00 assessed valuation thereof; . . . the action of said Commissioners in requesting the levy and assessment of said tax was unlawful, illegal and not authorized by law, by reason of the following:

"1. Said Commissioners on behalf of said District have purported to borrow, and to incur an indebtedness in the sum . . . of $39,000., within the two years last past, the amount of which indebtedness exceeded the total amount of the estimated tax income of said District for the year in which said indebtedness was purported to have been incurred and also exceeded the total amount of the estimated tax income of said District for the ensuing year; and

"2. Said Commissioners propose and intend to use and disburse the funds of said District now on hand and the proceeds of said tax, or a portion thereof, so levied and assessed as aforesaid to pay and discharge said alleged indebtedness; and

"3. Said Commissioners have acquired certain land and have constructed thereon, within two years last past, a swimming pool for recreation purposes in the Ben Lomond district of said District; and

"4. Plaintiffs are informed and believe and therefore allege that said Commissioners propose and intend to use and disburse a portion of the proceeds of said tax to pay for said land or to pay for the construction of said swimming pool; and

"5. The construction of a swimming pool by said District was and is not a proper purpose of said District; and

"6. No election by the voters of said District has been held. and neither said Commissioners nor said District have ever been authorized by any such election or otherwise; (a) to incur said indebtedness or (b) to pay said indebtedness or (c) to acquire said land or (d) to construct said swimming

pool or (e) to purchase said land or any other land (f) to pay for said swimming pool; and

"7. Plaintiffs are informed and believe and therefore allege that said Commissioners propose and intend to acquire other land and to purchase fire apparatus and equipment and to pay for the same with the funds of said District, all without submitting such proposals to the voters of said District."

A general and special demurrer was interposed and overruled.

The answer sets forth, "COME NOW the defendants BEN LOMOND FIRE DISTRICT . . . and EARL L. LYON, FRANK R. PIMENTEL, and F. A. WHITAKER (The District and said Earl L. Lyon, Frank R. Pimentel, and F. A. Whitaker being hereinafter referred to as 'the answering defendants'), and by way of answer to the Amended Complaint on file in the above-entitled proceeding, admit, deny and allege as follows:" Thereupon the defendants admit the allegations of paragraph one of the amended complaint which refers to the three commissioners in their official and not in their individual capacity. The answer alleged that the water reservoir needed improvements as expressed in a resolution passed by the commissioners. The district commissioners agreed to buy real property for $300. The answer alleged, "that on September 19, 1945 Granite Construction Company of Watsonville, California, by a written instrument offered to the District to make said improvements and repairs on a cost plus 15% basis; that on September 22, 1945 the District by a written instrument accepted said offer, promising to pay said company the cost plus 15% of said improvements and repairs; that the Board of Fire Commissioners of the District by resolutions duly adopted and entered upon its minutes, ordered said improvements and repairs to be made and resolved to purchase said real property; that said improvements and repairs were completed in June, 1946; that the entire cost thereof was $38,-195.93, including the purchase price of $300 for said real property;

"(c) That at the time when the aforementioned contract with Granite Construction Company was made, the District had no indebtedness other than that created by said contract, and had funds on hand amounting to $6,349.13; that the entire cost of said improvements and repairs, including the purchase price of said real property, was paid on or prior to July 1, 1946, excepting only a balance of $2,895.93; that said balance was paid on or prior to August 30, 1946; that on July 29, 1946

defendant Commissioners on behalf of the District borrowed the amount of $20,000 and on September 2, 1946 the additional amount of $7,895.93, and no other amount or amounts of money whatsoever at the times mentioned or at any other time since July 1, 1945; that the District borrowed the aforementioned amounts by issuing therefor in each instance its promissory note promising to repay the amount borrowed on or before June 30, 1948, with interest at the rate of 4% per annum, payable quarterly; that the aggregate amount of all moneys borrowed by defendant Commissioners on behalf of the District since July 1, 1945 does not exceed $27,895.93; and that the aggregate indebtedness incurred by defendant Commissioners on behalf of the District, taking into account the funds on hand at the time when such indebtedness was incurred as aforesaid, at no time exceeded $31,846.80.''

Excepting a small balance, ''the entire cost of improvements and repairs, including the purchase price of the property'' *was paid* prior to obtaining the loans in the sums of $20,000 and $7,895.93 respectively as appears from the above quoted answer.

As a separate defense the district commissioners alleged laches and estoppel.

On November 8, 1946, an order was filed directing defendants to show cause why they should not be enjoined from collecting the tax described in plaintiffs' complaint, and restraining them from ''paying out or disbursing the proceeds of the collection of said tax, or any part thereof, until the further order of this Court.'' It was stipulated that said preliminary injunction remain in full force to November 19, 1946. On April 17, 1947, an ''Order Granting Preliminary Injunction'' was filed.

The issues joined by the amended complaint and the answer of ''Ben Lomond Fire District and Earl L. Lyon, Frank R. Pimentel and F. A. Whitaker, Commissioners of Ben Lomond Fire District'' were subsequently tried. Evidence was introduced to the effect that the commissioners had adopted a resolution ''to construct a dam in the San Lorenzo River and to acquire a strip of land on the south bank of the river.'' There is evidence that a copy of the resolution is in the files and signed by commissioner F. A. Whitaker. On September 19, 1945, an agreement to construct the dam was executed and work was started. In December, 1945, and in March, 1946, the commissioners paid $4,000 and $6,000 respectively from the funds of the district to the Granite Company. Construc-

tion of the dam was completed in June, 1946. By that time there had been due the Granite Construction Company $27,-895.93 *which commissioner Lyon had personally advanced from his own funds* with the exception of $2,895.93 which subsequently Mr. Lyon also paid.

Evidence of the fiscal history of the district, largely produced by defendants, was presented by plaintiffs. The purpose of such evidence was to show that the indebtedness of $27,895.93 was illegal. It was stipulated that the district's cash book showed that the balance on June 30, 1944, was $3,065.41; on June 30, 1945, was $7,797.46, and on June 30, 1946, was $3,450.75. It was stipulated that at the time of trial $22,324.52 was on hand.

Maps of the area and diagrams of the dam were introduced as exhibits. There is some evidence with respect to leveling and filling and the erection of a retaining wall indicating that the project in addition to the retention of water for fire purposes had certain recreational aspects. However, the main question is whether the district commissioners had any power to authorize the building of the dam in view of the facts and circumstances presented. Commissioner Lyon was the only witness called in defense. He testified to the method of combating fires and in particular the inadequacy of water to fight fires in certain parts of the district.

The minutes of the district commissioners of *October 15, 1945* show, ''Commissioners met and discussed a new dam and pump station. Fire Department and community desire for the improvement weighed and negotiations discussed for Granite Construction Company of Watsonville to start work on time and material basis for dam and wings, estimated cost $6200. Work ordered started by Commissioners. Earl Lyon, Secretary.'' The record shows that prior to the passage of the resolution the Granite Construction Company had entered into a contract with the district commissioners on September 3, 1945. However, the minutes were frequently prepared prior to a meeting and sometimes subsequent thereto. An inference could reasonably be drawn from the estimated figure appearing in the resolution that the work then contemplated could not be performed for the amount stated.

The commissioners of the district negotiated a loan with the Bank of America for $20,000 after they had passed a resolution to that effect. Mr. William T. Rice, vice president and manager of the Santa Cruz branch of the Bank of America, called as a witness on behalf of plaintiffs, testified relative

to the details of the transaction. It appears that the commissioners purported to pledge the credit of the district and signed a separately executed document personally guaranteeing the payment of the $20,000 obtained from the bank. Pursuant to the transaction ''the bank then disbursed $20,000 to Earl Lyon.'' Later another promissory note to Mr. Lyon's order was executed for $7,895.93 bearing the signatures of Lyon, Pimentel and Whitaker as district commissioners.

Prior to the submission of the evidence plaintiffs were given permission to file an amended complaint to conform to the proof.

The court found the material allegations in the first count of the second amended complaint to be true with certain exceptions. The court found that Lyon personally paid $27,-895.93 of the district's indebtedness of $38,195.93; that Lyon, Pimentel and Whitaker, purporting to act as commissioners of the district, executed a promissory note for $20,000 to the Bank of America, so as to reimburse Lyon $20,000, and that Lyon, Pimentel and Whitaker, purporting to act as commissioners of the district, executed a promissory note to Lyon individually for $7,895.93, purporting to bear interest at the rate of 4 per cent per annum from May 21, 1946. The court also found that, ''The estimated tax income of said Fire District for the fiscal year commencing July 1, 1945, and ended June 30, 1946, was nil by reason of the following: the amount reasonably required for the maintenance of said Fire District during said fiscal year was the sum of $3900.00; the amount of cash on hand in the fund of said Fire District on June 30, 1945, was the sum of $7,797.46.

''The estimated tax income of said Fire District for the fiscal year commencing July 1, 1946, and ended June 30, 1947, was nil by reason of the following: the amount reasonably required for the maintenance of said Fire District during said fiscal year was the sum of $4400.00; the amount of cash on hand in the fund of said Fire District on June 30, 1946, was the sum of $3,450.76 in the hands of the County Treasurer of said County of Santa Cruz and the sum of $10,000.00 illegally disbursed by said defendant Commissioners.

''The estimated tax income of said Fire District for the fiscal year commencing July 1, 1947, and ending June 30, 1948, is nil by reason of the following: the amount reasonably required for the maintenance of said Fire District during said fiscal year is the sum of $6090.00; the amount of cash on hand

in the fund of said Fire District on June 26th, 1947, was the sum of $22,324.52.''

The court concluded that plaintiffs were entitled to an injunction permanently restraining defendants and their agents and successors from ''Disbursing any of the funds of said Fire District now in or to come into the County Treasury of said defendant County of Santa Cruz, for the use and account of said Fire District, except in payment of salaries or wages of employees of said Fire District or in payment of charges for maintenance or repair of the existing facilities of said Fire District.'' The defendants were enjoined from paying any of the money from the district to the bank in payment of the $20,000 promissory note or to defendant Lyon in payment of the $7,895.93 promissory note.

The court concluded that the levy of the tax of $3.96 per $100 assessed valuation for the year 1946-1947 for the use of the fire district was illegal and void and that the indebtedness incurred in the erection of the dam was illegal and that the district is entitled to judgment against Lyon, Pimentel and Whitaker ''individually'' for $10,000. The original judgment and decree is in accord with the findings and conclusions of law.

A third supplemental complaint was filed alleging that the order temporarily restraining an election to approve a special tax of $39,000 set forth in the second supplemental complaint had been dissolved and prayed that defendants be enjoined from holding such election or any election to levy any tax with which to pay the notes to the bank and to Lyon. The relief was granted.

Demurrers and motions to strike the whole or part of the various amended and supplemental complaints were filed. The demurrers were overruled and the motions denied. In some instances answers appear to have been filed subsequent to a hearing. However, the order to the effect that the district is entitled to judgment against Lyon, Pimentel and Whitaker individually for $10,000 was stricken from the judgment and decree.

■ Plaintiffs' appeal may be disposed of preliminarily. Plaintiffs appeal from an ''order Setting Aside and Vacating Portion of Judgment'' and from an ''Amended Judgment and Decree'' dated September 26, 1947. Each order and judgment involves the same question, which may be stated as follows: Assuming that the transaction of payment of $10,000 from the funds of the district was expended without official au-

thority may the commissioners be held personally liable? This item should not be confused with the money advanced by Commissioner Lyon. The amount was paid in two installments from the district "maintenance" funds.

A taxpayer, by civil action in certain cases, may compel a public official to personally repay to the public treasury public funds expended without authority. (*Osburn* v. *Stone,* 170 Cal. 480 [150 P. 367], quoted with approval in *Mines* v. *Del Valle,* 201 Cal. 273 [257 P. 530] ; see also *Mahoney* v. *San Francisco,* 201 Cal. 248 [257 P. 49].) However, if a judgment is sought against an official in his individual capacity he should be so designated in the complaint. "Identity of parties means not only that they must be identical in person, but that the capacity in which they appear must be the same. A judgment for or against a party in one right or capacity cannot affect him when acting in another right or capacity." (15 Cal.Jur. § 218, p. 188.) In the Osborne and other cases cited by plaintiffs this precise point was not raised. An amended complaint supersedes an original complaint and is the basis for the cause of action (*Morehead* v. *Turner,* 41 Cal.App.2d 414 [106 P.2d 969]), though the original or prior amended complaint may tend to clarify the final amended complaint. In the present case, until the filing of the decision and judgment no attempt was made by plaintiffs to definitely charge the three commissioners individually. In the original decision the trial court included as a conclusion of law that the district was entitled to a judgment with interest against the commissioners individually on $4,000 from December 5, 1945, and on $6,000 from March 6, 1946. The judgment followed this conclusion of law.

The commissioners were designated in the original and amended and supplemental complaints as officials. The prayer requesting an injunction is limited to acts which the commissioners could perform as commissioners. A fair sample of a paragraph from the prayer of the amended complaint is as follows: "Adjudging that said defendant Commissioners are indebted to said defendant District in such sum as they may have disbursed the funds of said defendant District for the unlawful purposes aforesaid."

In great measure plaintiffs rely upon *Mock* v. *City of Santa Rosa,* 126 Cal. 330 [58 P. 826]. A prayer attached to the complaint indicates the theory upon which the action is based, but when appropriate or general relief is requested

assistance may be awarded which is consistent with the special prayer. (30 A.L.R. 1176.) In the Mock case judgment was given individually though the complaint alleged the facts against most of the defendants as official acts. In great part the justification for such action was the prayer for general relief. A fair reading of the Mock case indicates fraud in the commission of ministerial official acts and hence there was justification in holding the officials personally liable. The evidence in the present case does not indicate that defendants possessed an intent to defraud the district. Their mistake appears to be that they used poor judgment. In *People* v. *Standard Accident Ins. Co.*, 42 Cal.App.2d 409, at page 411 [108 P.2d 923] the court said, ''Generally, a public officer is not liable in an action if he falls into error, in a case where the act to be done is not merely a ministerial one but is one in relation to which it is his duty to exercise judgment and discretion, even though an individual may suffer by his mistake, when he acts in good faith, within the scope of his authority and without malice, corruption or sinister motives. When the law trusts to the sound judgment and discretion of an officer, public policy is said to demand that he be protected from the consequences of erroneous judgment. (21 Cal.Jur. 911.)''

The trial court was justified in making its order vacating a portion of the original judgment which gave personal judgment against the defendants. Plaintiffs' appeal is without merit. The action of the trial court in this respect must be affirmed.

On defendants' appeal it is contended that the evidence is insufficient to support certain findings of fact.

The complaint alleged and the court so found that Commissioner Whitaker was at all times covering the periods mentioned in the complaint a ''duly elected, qualified and acting commissioner'' of the designated fire district. The record does not disclose that Commissioner Whitaker ever took the stand to deny such allegation though it does appear in an unsigned deposition of his that he became a commissioner in April, 1946. However, Whitaker wrote the minutes of the commissioners' meeting of September, 1945, according to Commissioner Lyon. It was on September 3, 1945, that the resolution was passed ''to construct a dam in the San Lorenzo River and to acquire a strip of land on the south bank of the river.'' The amended complaint alleged that, ''Defendants Earl L. Lyon, Frank R. Pimentel and F. A. Whitaker . . .

at all times herein mentioned were and now are all of the duly elected, qualified and acting commissioners of defendant Ben Lomond Fire District.'' The answer admitted the allegations of the quoted paragraph. The point need not be further considered.

█ The finding that the dam "produced a quantity of water far and greatly in excess of the proper or necessary needs of said fire district'' is criticised as lacking support in the evidence, as is the finding "that said excessive construction was required only for recreational purposes, to wit: to provide a swimming pool'' and the finding "that the fire protection facilities provided and afforded by said dam were not sufficient to provide fire protection for more than ten per cent (10%) of the area of said Fire District.'' Commissioner Lyon described the adequacy of the water supply as follows: "The northern part of the district, along highway number 9, is fairly adequate, in which they have a six inch main under heavy pressure from Boulder Creek. That stops at Marshall Creek. From there on the supply is very inadequate for fire fighting purposes; from Ben Lomond, where there is a six inch main, you cannot maintain one fire fighting stream.'' Plaintiffs also rely upon Lyon's testimony to support their contention that the trial court's findings are correct, because "In the northern part of the District from Boulder Creek to Marshall Creek there is a 6-inch main under heavy pressure. There is adequate water in the San Lorenzo River available wherever there is access for portable pumps. In Ben Lomond there is a 6-inch main with hydrants producing 205 gallons per minute.'' As to the last mentioned fact, Lyon testified that such a stream "is not a standard stream,—250 a minute.'' The evidence supports the finding that the fire protection facilities provided by the dam "were not sufficient to provide fire protection for more than'' 10 per cent of the area of the fire district, since the abundance of water provided by the dam was primarily available only to the area around Ben Lomond.

█ Defendants also criticize the findings relative to the estimated income of the fire district for the fiscal years 1945-1946 and 1946-1947. It appears that the court took the figures from the respective budgets relating to maintenance, operation and repairs but omitted the figures covering prospective improvements, capital outlay and reservoir, including interests and attorney and other legal expenses. The court found that the estimated income for each period was nil. The trial court's

516

conclusion is in accord with plaintiffs'' view of the estimate of tax income, the factors of which are set forth in plaintiffs' brief. This court adopts that definition as appropriate to the facts of this case and in accordance with the provisions of Health and Safety Code, section 14150. The factors are enumerated as ''the amount of cash on hand; the amount required to meet *lawful expenditures* during the year; and the amount of taxes which can be *lawfully levied* for that year. A debt limitation cannot be ballooned by fanciful estimates or by items *for which a tax cannot be lawfully levied.*'' That the definition is appropriate will appear from the next subject.

 Defendants urge that the judgment was prematurely given in that at the time the original judgment was signed the second supplemental complaint to the second amended complaint was on file and the issues raised therein were neither joined nor tried. Defendants filed their answer to the second supplemental complaint several months after the decision on the original hearing. That decision provided, under the heading of ''Addendum to Judgment and Decree'': ''It is Further Ordered, Adjudged and Decreed that this Court shall retain full jurisdiction and control of this cause, to make any and all orders and decrees from time to time as shall be necessary to effectuate its decision and judgment herein and as may be necessary to administer further equity between the parties and that this judgment and decree shall be deemed interlocutory.''

The pleading referred to by defendant is a supplemental complaint in reference to the calling of a special election subsequent to the trial. The filing of a supplemental complaint alleging facts material to the case occurring subsequent to the time that issues have been raised by complaint and answer is a matter in the discretion of the court. In *Union Oil Co. v. Reconstruction Oil Co.*, 20 Cal.App.2d 170, at page 183 [66 P.2d 1215] the court stated, ''However, it is a familiar principle of equitable procedure that equity having once acquired jurisdiction of the subject matter of an action will retain it to the end that a complete adjudication of all conflicting rights may be had and a final determination of all matters in controversy may be accomplished. The damage suffered by respondent occurred after the suit for injunctive relief had been filed and was a matter which grew out of the situation portrayed by the allegations of respondent's complaint. It was therefore purely incidental to the relief which

respondent originally sought by its equitable action and a court of equity having properly acquired jurisdiction was justified in retaining it until all issues in the action should be determined." (Code Civ. Proc., § 464; *Supreme Grand Lodge* v. *Smith*, 7 Cal.2d 510 [61 P.2d 449].) ▉ The record does not indicate that defendants were prejudiced on issues raised in the supplemental complaints and the answers thereto by the entry of the original decision prior to filing answers to the supplemental complaint.

A supplementary writ of injunction was signed and served on the district commissioners. It enjoined the several defendants as commissioners from disbursing any funds for the calling of an election for the purpose of authorizing a special tax to collect $39,000 for the purpose of paying for the dam. The writ was specifically directed to "County of Santa Cruz" and "Sidney Carter, County Treasurer of said county." The election was called by the commissioners, but the cost of the election, if held, would be disbursed by the county treasurer.

The purpose of the election was to validate the illegal acts of the commissioners. Political rights would not be curtailed and injunction was the only adequate remedy to protect plaintiffs. (*Johnston* v. *Board of Supervisors*, 31 Cal.2d 66 [187 P.2d 686].) The plan of building the dam and raising funds therefor adopted by the commissioners was illegal. An election would simply approve an illegal and inoperative project. "Where it is proposed to hold an election for the submission of a measure to the popular vote, and that measure will be wholly void and inoperative even if adopted by the people, the courts may, at the instance of a resident taxpayer, enjoin the holding of the election upon the ground that it will be a useless expenditure and waste of public funds (Code Civ. Proc., sec. 526a)." (*Harnett* v. *County of Sacramento*, 195 Cal. 676, 683 [235 P. 445].)

▉ It is contended that the judgment and decree is in excess of the trial court's jurisdiction. The vital question in this case was what funds, if any, might be used in the construction of the dam. Funds originating under the power to levy an annual maintenance tax may be used for such specific purpose and none other. The attempt to use such funds to pay for the dam or to buy lands was illegal.

▉ Defendants emphasize that the fire district has received the benefit of the erection of the dam; that the construction "work was done openly and that every tax payer in the district could, and undoubtedly did, see the work in progress";

that no protest was registered, and that plaintiffs are estopped from maintaining this action. There is no proof that the individual citizens who filed this action knew of the erection of the dam until its completion and no proof that the citizens whom they represent should have known of the illegal procedure adopted. There is no proof and hence no merit in the allegations of the answer that plaintiffs are estopped from proceeding in this action.

Defendants claim that the trial court misinterpreted certain statutes in rendering its judgment. Defendants claim that they are entirely governed and controlled by sections of the Health and Safety Code, based on Statutes, 1881, chapter 36, section 3, which provide for the general powers and duties of district boards. The sections are found in Division 12, part 3, article 4 of the Health and Safety Code and read as follows:

Section 14073, "The district board shall have perpetual succession." Section 14074, "It may make all necessary or convenient contracts with persons engaged in the supply and distribution of water, for a supply of water, and for attaching hydrants or fire plugs to their pipes, conduits, or cisterns." Section 14077, "It may take by grant, purchase, gift, devise, or lease, and hold, use, enjoy, and lease, or dispose of real and personal property of every kind, necessary for the exercise of the powers of the district." Section 14078, "It may construct or otherwise acquire suitable firehouses and other buildings or structures suitable for housing the equipment, apparatus and supplies of the district, or for carrying on its business and affairs. All property shall be taken and held in the name of the district." Section 14079, "The district board may sell, or otherwise dispose of real and personal property acquired by the district where it has ceased to be suitable for the uses of the district."

The real question in this respect deals with the nature of the "power" to construct the dam. The general powers conferred by the sections relied upon by defendants are subject to the specific limitations of the Health and Safety Code provisions on finance and taxation found in the same division of the same code and designated as article 6. The appropriate sections provide: Section 14150, "The district board may borrow money and incur indebtedness in anticipation of the revenue for the current year in which the indebtedness is incurred or of the ensuing year thereafter. Such indebtedness shall not exceed the total amount of the estimated tax income

for either the current year or the ensuing year." Section 14154, "A special tax may be levied upon the property within the district if authorized by a majority vote of the voters voting on the proposition for a special tax at the annual election or at a special election called by the district board for the purpose." Section 14155, "Special taxes are in addition to the annual maintenance tax." Section 14156, "A special tax may be voted for the purpose of acquiring land or erecting buildings or purchasing apparatus and equipment or buildings or for paying indebtedness of the district previously incurred."

As originally enacted the board of fire commissioners had to submit to the electors residing within the fire limits "the question whether a tax shall be levied and raised for the purpose of establishing and maintaining a fire department" and "the propriety of levying and raising an additional tax for the keeping in repair the apparatus of said fire department, and maintaining the same in good order and condition." (Stats. 1881, ch. 36, §§ 3(3) and 18.) In 1919, the following was added: "Sec. 3½. The board of fire commissioners . . . are further authorized and empowered, in their discretion, to purchase or otherwise acquire land and to erect thereon a firehouse for purposes of housing the fire equipment and fire apparatus, or to purchase or otherwise acquire land already (thus) improved . . . and to pay for said land, improved or unimproved, as the case may be out of the annual tax provided for under section nine of this act, or by special tax to be voted by the voters within the fire limits." (Stats. 1919, ch. 9, p. 8.) As to the sale of land, it was provided "that if the same shall have been originally acquired pursuant to the vote of the electors within the fire limits . . . then the same shall not be sold excepting by like vote," otherwise the board had power to sell. (Stats. 1919, ch. 9, p. 9.)

Defendants disagree with the trial court's interpretation of the word "maintenance." It is contended that the term as used by the court is limited to the repair or upkeep of existing facilities, but that it actually is broad enough to include the establishment and equipping of the new dam. The word as used in sections 14152 and 14153 means the repairing or keeping in good condition the articles or things that exist, including salaries and costs of operation and not the creation of something new. In *Whitmore* v. *Brown,* 207 Cal. 473, at pages 483-484 [279 P. 447], the court stated, "The charter allows the levy of the tax for the 'support' of public schools 'for the

ensuing year.' The words 'support' and 'maintenance' are convertible terms in the scheme of the Political Code respecting public schools. For example, referring to high schools 'maintaining the high school' is provided for in section 1756 and in sections 1760 and 1761 the word 'support' is found used to convey the same meaning. Again, in section 1840 we have the word 'maintenance' used in the same connection. We also find the significant fact that purchasing lots, building buildings, making permanent improvements and such like outlay is not included under the head of 'maintenance' or 'support.' (See Pol. Code, secs. 1755, 1830, 1838 and 1840.)

"It is also to be noted that taxation for building purposes comes under a different limit from taxation for support or maintenance. (See Pol. Code, secs. 1755, 1838, 1839.)"

Defendants urge that Health and Safety Code, section 14156 is permissive, since the word "may" is used. All of the sections must be read to eliminate confusion and create harmony in interpretation. In sections 14152 and 14153 the word "shall" is used. Those sections, when read with others, indicate that money for purposes other than maintenance must be obtained through the means of a special tax. (See §§ 14154, 14155 and 14156.)

The subject of "borrowing" money is touched upon at this point only in relation to the "advances" made by Commissioner Lyon, which may be considered a loan, and that he was acting in his individual capacity as to such "advances" of over $27,000 to the Granite Construction Company. The evidence shows that it was his personal money and that the personal advance by Lyon was a separate transaction from the official payment of the district's funds of $10,000 to the Granite Company and distinct from the transaction, if any, with the Bank of America. Upon the evidence presented, finding II, that Lyon used his personal funds to pay Granite, must be upheld.

The district board's power to borrow is limited to an indebtedness "in anticipation of the revenue for the current year in which the indebtedness is incurred or of the ensuing year thereafter." (§ 14150.) The use of the conjunction "or" assumes an alternative. It is often used "either, or" and means that one of two courses must be adopted. Accordingly, a loan must be made under the provisions of section 14150 either in anticipation of an indebtedness for the current year or of the ensuing year, but not under both plans. The loan, if there was a loan, from Lyon to the district is ultra

vires. The "advance" was not made in anticipation of revenue for the current year or of the ensuing year. (*Bottoms* v. *Madera Irr. Dist.*, 74 Cal.App. 681 [242 P. 100]; *Selby* v. *Oakdale Irr. Dist.*, 140 Cal.App. 171 [35 P.2d 125].)

What has been said on the last two points, "maintenance" and "borrowing," is applicable in answer to defendants' statement that, "An indebtedness incurred by the Commissioners for lawful purposes even though in excess of the statutory limitation is valid and binding upon the district to the full amount permitted by the statute and the trial Court erred in holding that such an indebtedness is invalid in its entirety." The position of defendants on this point ignores the fact that the estimated tax income for each year was *nil*. In brief, the argument is without merit as applied to the facts of this case in view of the finding by the trial court based upon substantial evidence and proper statutory construction that the district commissioners acted without authority in building the dam.

Defendants' first and last contention is that the court's decree that the execution of a promissory note for the principal sum of $20,000 to the Bank of America is void on the ground that the Bank of America was not a party to this action.

The court found that, "On September 3, 1946, said defendants Lyon, Pimentel and Whitaker, purporting to act as Commissioners of, and on behalf of, said Fire District, executed a promissory note, dated September 3, 1946, to said defendant Lyon individually for the principal sum of $7,-895.93 for the purpose of reimbursing said Lyon for the balance, to wit: the sum of $7,895.93 of said sum of $27,895.93 so paid by him on account of said indebtedness of $38,195.93 herein referred to; said promissory note purported to bear interest at the rate of 4% per annum from May 21st, 1946." The court decreed that such "Promissory note, dated Sept. 3, 1946, to Earl L. Lyon, for the principal sum of $7,895.93, purportedly by and on behalf of defendant Ben Lomond Fire District, was illegal and is void and is hereby invalidated." In view of all that has been said before, this court is unable to interfere with that part of the judgment. If there is an obligation between Lyon and his fellow commissioners individually, such question is not before this court, and anything said herein should not be construed as an expression of opinion on that particular subject. This question should not be

confused with the question on plaintiffs' appeal. There it was held that the commissioners were not sued individually and not liable individually. In the present question, the acts of the commissioners, insofar as they acted officially, were illegal.

The claim is made that the Bank of America was an indispensable party to this action. The history of this subject is interesting. The complaint or the amendment thereto does not refer by name to the Bank of America. The first pleading to mention the bank is the answer to the amended complaint. All of the evidence was introduced by plaintiffs except some defense testimony by Commissioner Lyon. Plaintiffs presented the evidence of the Bank of America loan, but it is plain that such evidence was introduced to give a complete picture of all of the acts of the district commissioners. Having made an issue in the pleadings of the bank loan transaction it would appear that defendants should have insured the appearance of the bank as a party to this action. Plaintiffs having introduced the evidence might well have protected their rights by bringing in the bank as a party. In *Hartman Ranch Co.* v. *Associated Oil Co.,* 10 Cal.2d 232 [73 P.2d 1163], approved in *Schubert* v. *Bates,* 30 Cal.2d 785 [185 P.2d 793], it was held that the requirement that indispensable parties appear in the court proceedings is mandatory.

The rule is stated in *Ambassador Petroleum Co.* v. *Superior Court,* 208 Cal. 667 [284 P. 445], that to reach a complete determination the necessary parties must be present. In *Miller* v. *McKinnon,* 20 Cal.2d 83, at page 99 [124 P.2d 34, 140 A.L.R. 570], the court stated, "The court may, of course, order proper parties to be brought in if expedient for a complete determination of the controversy. (Code Civ. Proc., sec. 389.)"

To the question whether the commissioners have a right under the law and the facts of this case *to construct the dam* and whether it is necessary to make the bank a party to the action to determine that question, the answer must be in the negative, but when plaintiff sought and the court acquiesced in a decree invalidating the promissory note to the bank of the district commissioners in their official capacity the court voided a promissory note without extending to the payee of the note the right and benefit to defend factually and legally.

While the bank was not an indispensable party to a determination of the real issue in this case, it was an absolutely necessary party to the proceedings before a judicial decree

could be effective concerning the bank's legal rights relative to the loan transaction.

However, it was not necessary to mention the Bank of America in the judgment and decree in view of the prohibition against the expenditure of the questioned district funds for any purpose except maintenance. The decree is interlocutory and the error may be corrected. In the "Addendum to Decision" the court decreed, "That the Court shall retain full jurisdiction and control of this cause to make any and all orders and decrees from time to time as shall be necessary to effectuate its decision and judgment herein and as may be necessary to administer further equity between the parties and that the judgment and decree made pursuant to this decision shall be deemed interlocutory."

The trial court is directed to modify the judgment and decree by deleting from the findings, conclusions of law and the judgment all reference to the invalidity of the $20,000 note to the Bank of America signed by the defendants as district commissioners. This order of modification is not to be construed as any interference with the bank's right to file any action within the statutory period of limitation.

The orders appealed from by plaintiffs are affirmed. The original judgment as amended will stand affirmed when modified as directed herein. All other orders appealed from are affirmed.

Costs to be recovered on each appeal by respective respondents.

Peters, P. J., and Bray, J., concurred.

A petition for a rehearing was denied May 28, 1949, and defendants and appellants' petition for a hearing by the Supreme Court was denied June 27, 1949. Schauer, J., voted for a hearing.